FILED
2025 Jul-18  AM 11:08
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHWESTERN DIVISION

| | | |
|---|---|---|
| **JOSEPH DIERKING, JR.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **Case No. 3:24-cv-308-LCB** |
| **SOCIAL SECURITY** | ) | |
| **ADMINISTRATION,** | ) | |
| **COMMISSIONER,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## <u>MEMORANDUM OPINION</u>

Plaintiff Joseph Dierking seeks judicial review of the final decision by the Social Security Administration's Commissioner to deny his claim for disability benefits. 42 U.S.C. § 405(g). The Court has closely examined the record, and now **AFFIRMS** the Commissioner's decision for the reasons explained below.

## I.    BACKGROUND

### A.    Standard of Review

A court's only task in reviewing a denial of disability benefits is to determine whether the Commissioner's decision is "supported by substantial evidence and based on proper legal standards." *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011). Substantial evidence "is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Id.*

Thus, courts reviewing an appeal from a denial of disability benefits may not "decid[e] the facts anew, mak[e] credibility determinations, or re-weigh[ ] the evidence." *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005). Rather, the court must affirm the Commissioner's decision if the denial is supported by substantial evidence, even if the preponderance of the evidence weighs against the Commissioner's findings. *Henry v. Comm'r of Soc. Sec.*, 802 F.3d 1264 (11th Cir. 2015); *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983).

## B. Procedural History

Dierking first applied for disability insurance benefits on July 8, 2021, Tr. 186, alleging disabilities consisting of heart failure, edema, asthma, "joint damage due to Gout and Pseudo gout," arthritis pain, heart palpitations, fatigue, sleep apnea, chest pains, and cardia arrhythmias. *Id.* at 242. At the time of his application, Dierking reported being 6'4" and 300 pounds. *Id.* Dierking's claim was initially denied on March 24, 2022, *id.* at 92, and denied again after reconsideration on February 1, 2023. *Id.* at 104. Dierking requested a hearing by an ALJ on February 16, 2023, *id.* at 111, and the ALJ held a hearing on June 27, 2023. *Id.* at 42. Dierking was represented by counsel at that hearing, which also included testimony from an impartial Vocational Expert. *Id.* at 44.

On August 30, the ALJ again denied Dierking's claim, *id.* at 7, and the ALJ's unfavorable decision became final after the Social Security Appeals Council denied

review on January 12, 2024. *Id.* at 1. Having exhausted his administrative remedies,

Dierking appealed the Commissioner's final decision in this Court on March 12,

2024. Doc. 1.

### C.    The Social Security Disability Framework

The Social Security disability framework requires an ALJ to ask a series of

questions to determine whether an applicant qualifies for disability benefits:

(1) Is the claimant engaged in substantial gainful activity?
(2) Does the claimant have a severe impairment?
(3) Does the claimant have an impairment or combination of impairments that meet or medically equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1?
(4) Is the claimant able to perform former relevant work?
(5) Is the claimant able to perform any other work within the national economy?[1]

20 C.F.R. §§ 404.1520(a), 416.920(a); *McDaniel v. Bowen*, 800 F.2d 1026, 1030

(11th Cir. 1986).

These steps are progressive, and the inquiry ends if the ALJ finds that the

claimant has not met the requirements of any individual step. As a result, an ALJ

will reach Step 4 only if a claimant is not engaged in substantial gainful activity

(Step 1), has a severe impairment (Step 2), and does not have an impairment or

combination of impairments that meets or medically equals a listed impairment (Step

3). *McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986). Then, between Step

---

[1] A claimant bears the burden of proof through Step 4, but the burden shifts to the Commissioner at Step Five. *See Wolf v. Chater* 86 F.3d 1072, 1077 (11th Cir. 1996). The ALJ here did not reach Step 5.

3 and Step 4, the ALJ must determine the claimant's residual function capacity ("RFC"), which is the claimant's ability to perform work of any kind despite "all . . . medically determinable impairments" of which the ALJ is aware, "including . . . medically determinable impairments that are not 'severe.'" 20 C.F.R. § 404.1545(a)(2).

Once the claimant's RFC is established, the ALJ compares the claimant's RFC to the demands of their former relevant work (Step 4) and any other work in the national economy (Step 5). If a claimant can perform former relevant work, or the Agency can show that the claimant is able to perform any other work in the national economy, then the claimant is not disabled. 20 C.F.R. §§ 404.1512(f), (g).

### D.    The ALJ's Analysis

The ALJ's opinion followed the required analysis to the letter. *See* Tr. 10-31. At Step 1, the ALJ found that Dierking had not engaged in substantial gainful activity since June 10, 2021. Tr. 12.

At Step 2, the ALJ found that Dierking suffers from multiple severe impairments, namely "heart failure; unspecific osteoarthrosis/gout; and obesity." *Id.* at 12 (citing 20 CFR 404.1520(c)). The ALJ also found that Dierking suffers from non-severe impairments, including "sleep apnea; hypertension; and asthma." *Id.* at 12-13. In this same category, the ALJ also found that Dierking's "unspecified

adjustment disorder, considered singly and in combination" was "non-severe." *Id.* at 13.

At Step 3, the ALJ found that none of the claimant's impairments met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. *Id.* at 17.

After Step 3, the ALJ concluded that Dierking possessed the RFC to perform "light work," following "careful consideration of the entire record," *Id.* at 20. The ALJ found that Dierking can "occasionally lift and/or carry, including upward pul[l]ing of 20 pounds, and can frequently lift and/or carry, including upward pulling of 10 pounds," that Dierking "has no limitation in the upper extremities for gross or fine handling." *Id.* at 25. As for limitations, the ALJ found that Dierking should not "work on ladders, ropes or scaffolds, unprotected heights, or around dangerous machinery," and should "have no frequent exposure to extreme cold, extreme heat, wetness, and humidity," or "fumes, odors, dusts, gases, and poor ventilation." *Id.* at 25-26.

In determining the RFC, the ALJ found that although Dierking's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," his "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other

evidence in the record." *Id.* at 21. Specifically, the ALJ found that Dierking's "allegations of severe and chronic limitation of function. . . preclud[ing] the performance of all substantial gainful activity . . . exceed all that can reasonably be expected from his impairments and are inconsistent with treatment records." *Id.*

The ALJ first "note[d] that [Dierking] had a significant history of heart issues that pre-dated the alleged onset date of disability," including "bypass surgery in 2005, heart catheterizations in 2003 and 2004, and defibrillator placement in October 2019." *Id.* The ALJ then considered Dierking's medical history after his alleged disability date of June 10, 2021. The ALJ reiterated that in August 2021 Dierking "denied chest pain but reported ongoing bilateral lower extremity edema," which was unsupported by a physical exam. *Id.* at 22. The ALJ also emphasized that as of November 2021, that Dierking "had no overt" symptoms of congestive heart failure, "no cyanosis, clubbing, or edema in the extremities, and no evidence of venous insufficiency or varicosities." *Id.* Examinations in February and April 2022 had nearly identical findings. *Id.* at 23.

The ALJ then discussed the results of Dierking's "lower arterial diagnostic testing." *Id.* at 24. Dierking underwent this testing in June 2022, and the diagnostic report "showed infero-popliteal disease and no stenosis" in the right lower leg, and "sever[e] disease with high grade stenosis and occlusions in the left lower" leg. *Id.* However, the ALJ reiterated that the diagnostic report did not show that Dierking

6

met the requirements for Medical Listing 4.12 (peripheral arterial disease), and that later medical records did not contain evidence of severe disease in that category. *Id.*

Finally, the ALJ also reviewed the Third Party Report from Dierking's wife, as well as medical opinion evidence from two State Agency medical consultants, a medical consultative examiner, and a psychological consultative examine. *Id.* at 26-28. The ALJ found the Third Party Report "probative, but not entirely persuasive" because it was "from non-medical sources and . . . based on subjective complaints . . . and casual observation." *Id.* at 26. The ALJ found the opinion of both State agency medical consultants "somewhat persuasive" because they were "only somewhat consistent with and supported by the medical evidence." *Id.* at 26-28. Dr. Jon Arnow, who examined Jensen in May 2018, found that Jensen "could perform medium work." *Id.* at 1909.

The ALJ found consultative examiner Dr. Fortenberry's opinion only "marginally persuasive," because the finding that Dierking had "mild to moderate limitations" in several categories "was vague and unclear." *Id.* at 27-28. The ALJ also found the opinion of psychological consultative examiner Dr. James Lindsey to be "mostly persuasive" to the extent it was "consistent with the [ALJ's] finding of mild limitations" and "objective evidence." *Id.* at 28.

After considering all this evidence, the ALJ concluded at Step 4 that although Dierking was unable to perform any past relevant work, his light work RFC would allow him to perform other jobs in the national economy (Step 5). *Id.* at 29-30.

## II.    DISCUSSION

### A.    The ALJ Properly Considered Dierking's Peripheral Vascular Disease.

Dierking argues that the ALJ's decision was not supported by substantial evidence for two reasons. First, Dierking says that "the ALJ "failed to adequately consider . . . Plaintiff's peripheral vascular disease" at Steps Two and Three of the analysis and in determining Dierking's RFC. Doc. 18 at 10. That claim fails because the ALJ gave adequate consideration to Dierking's peripheral vascular disease at each step, and his decision was supported by substantial evidence.

In support, Dierking says that a 2022 lower arterial study "revealed severe stenotic femoral arteries in his lower left extremity, including 80-99% stenosis of the common femoral artery and superficial femoral artery," in addition to "a totally occluded posterior tibial artery." *Id.* at 12. As a result, says Dierking, "it is well-established that [he] has a severe peripheral artery disease." *Id.* According to Dierking, the ALJ's failure to discuss Dierking's artery disease at Step Two of the analysis was "an error as a matter of law, as all impairment should be identified at" that step. *Id.* But that is not what's required by the relevant regulation, which dictates

only that the ALJ "consider the medical severity of [the claimant's] impairment(s)" at Step Two. 20 C.F.R. § 404.1520(a)(4)(ii).

Nor did the ALJ reach an impermissibly "conclusory finding" at Step Three that "the technical requirements of the listing" for peripheral vascular disease "were [not] met." Doc. 18 at 13. Dierking claims that the ALJ's decision was fatally flawed because—despite the ALJ's discussion of Dierking's peripheral vascular disease in his RFC determination—"the ALJ [did] not have a firm understanding of the Plaintiff's medical condition, as he relied on irrelevant findings to discount the severity of the condition." *Id.* at 14.

Not so. The deciding factor is not whether the ALJ had "a firm understanding" of Dierking's particular disease, *id.*, but whether the ALJ's conclusion was supported by substantial evidence. *See Sims v. Comm'r of Soc. Sec.*, 706 F. App'x 595, 604 (11th Cir. 2017) ("[u]nder a substantial evidence standard of review, [the claimant] must do more than point to evidence in the record that supports [his] position; [he] must show the absence of substantial evidence supporting the ALJ's conclusion."). Here, the ALJ's decision must be affirmed because the decision sufficiently and "systematically articulated [the ALJ's] reasons for rejecting" Dierking's claims based on the evidence in the record. *Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005).

The ALJ explicitly considered Dierking's peripheral arterial disease at Step Three, and found that his medical "records do not show a resting ankle/brachial systolic blood pressure ratio of less than 0.50, a decrease in systolic blood pressure at the ankle on exercise of 50 percent or more of pre-exercise level and requiring 10 minutes or more to return to pre-exercise level, resting toe systolic pressure of less than 30 mm Hg, or resting toe/brachial systolic blood pressure ratio of less than 0.40" as required by Medical Listing 4.12. Tr. 19; *see* 20 C.F.R., Part 404, Subpart p, App. 1 § 412A.

Crucially, Dierking's ankle/brachial blood pressure ratio was exactly .50 in June 2022, Tr. 88, and he has not provided any other records showing that he meets Listing 4.12's technical requirements. Further, Dierking points to no other evidence in the record the ALJ *should have* considered, nor could he, since he admits that "[d]espite the extremely severe nature of his [peripheral vascular disease], it not well-evaluated elsewhere in the medical evidence." Doc. 18 at 12-13. Given this lack of evidence—combined with the ALJ's findings that Dierking "had no overt" symptoms of congestive heart failure and "no cyanosis, clubbing, or edema in the extremities, and no evidence of venous insufficiency or varicosities" in November 2021, Tr. 22, or February and April 2022, *id.* at 23—the Court finds that the ALJ's conclusion that Dierking's peripheral vascular disease was not an impairment or

combination of impairments that met or medically equaled a listed impairment was supported by substantial evidence.

That is enough to affirm the ALJ's decision—"there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision, so long as the ALJ's decision . . . is not a broad rejection" that fails to show "that the ALJ considered [the Claimant's] medical condition as a whole." *Id.* To the contrary, the ALJ's decision here "demonstrates . . . that it considered the claimant's medical condition as a whole." *Buckwalter v. Acting Comm'r of Soc. Sec.*, 5 F.4th 1315, 1326 (11th Cir. 2021) (citing *Dyer*, 395 F.3d at 1211).

**B.    The ALJ Properly Accounted For All Dierking's Impairments.**

Second, Dierking argues that "the ALJ committed harmful error" by "fail[ing] to consider [Dierking's] impairments in combination at Step Three . . . and fail[ing] to obtain a medical opinion regarding medical equivalence." Doc. 18 at 17. That claim also fails, because Dierking admits that his conditions do not meet the requirements of any listed impairment, and the ALJ was not obligated to seek an outside medical opinion.

Dierking's argument is that his "obesity, severe peripheral artery disease, osteoarthrosis/gout, and heart failure medically equal [L]isting 1.18 because they render him unable to ambulate effectively . . . as a matter of law because the ALJ found that he was unable to walk on uneven terrain in the workplace." *Id.* at 18. And

because the inability to "ambulate effectively" was included in "prior Agency listings," *id.*, "Plaintiff would be considered unable to 'ambulate effectively' under the prior standards and thus would have technically met the requirements of the musculoskeletal listings only a few years ago." *Id.* at 19-20. Even so, it is not the ALJ's job—let alone this Court's—to determine whether a claimant qualifies for disability benefits under defunct regulations. As Dierking admits, his "conditions in combination do not technically meet the requirements of Listing 1.18, or any other listing." *Id.* at 19. That's the end of the line for Dierking's argument, or should be.

Dierking goes on to argue, however, that because Dierking would have qualified under the old listing, "there is a substantial probability that he medically equals the requirements of the revised medical listings." *Id.* at 20. And because this "substantial probability" raises "a substantial question regarding medical equivalence . . . the ALJ erred by not consulting a medical expert." Doc. 18 at 20. This argument is also unavailing because Dierking provides no authority for this proposition. More importantly, the ALJ was under no obligation to consult a medical expert on this question, because the regulatory authority to obtain additional evidence is entirely discretionary. 20. C.F.R. § 505.1420b(b) ("If the evidence in your case record is insufficient or inconsistent, we *may need* to take . . . additional actions") (emphasis added).

Nor is it true that "[o]nly a medical expert can assess whether a claimant medically equals a Listing." *Id.* at 21 (citing Soc. Sec. Ruling 17-2p). The Commissioner—and no one else—remains ultimately "responsible for making the determination or decision about whether" a claimant is disabled. 20 C.F.R. § 404.1520b(c)(3). That's why "the task of determining a claimant's residual functional capacity and ability to work rests with the administrative law judge, not a doctor" or medical expert. *Moore*, 649 F. App'x at 945 (cleaned up). So long as the ALJ's decision is supported by substantial evidence, as it was here, the decision must be affirmed. As said at the outset, this Court may not "decid[e] the facts anew, mak[e] credibility determinations, or re-weigh[ ] the evidence," *Id.* at 1211, and the Court declines Dierking's invitation to do so here.

## III.    CONCLUSION

Because the decision of the Commissioner was supported by substantial evidence, the Court **AFFIRMS** the decision and **DISMISSES** this case with prejudice. The Court will enter a final judgment separately.

**DONE** and **ORDERED** this July 18, 2025.

**LILES C. BURKE**
UNITED STATES DISTRICT JUDGE

13